HOLBROOK v. UNITED STATES (No. 77). KLIPSTEIN v. UNITED STATES (No. 80). SWAN v. UNITED STATES (No. 78). WELCH v. UNITED STATES (No. 81). OIL SEEDS CO. v. UNITED STATES (No. 79). HOFFMAN v. UNITED STATES (No. 82).[1]

1. REVIEWING QUESTIONS OF FACT.

Findings of the Board of Appraisers on doubtful questions of fact, turning upon the intelligence or credibility of witnesses, will not be disturbed, but when a finding would appear to be clearly contrary to the weight of the evidence, it is a duty devolved on this court to disregard it. United States v. Reibe, *supra*, p. 19 (T. D. 30776).

2. OLIVE OIL FOR MANUFACTURING OR MECHANICAL PURPOSES.

This importation, it seems, by a marked preponderance of the evidence, consisted of olive oil made of decayed fruit and shipped in a variety of containers, such as petroleum barrels or fresh goatskins; that it was ill smelling and rancid to the taste and was used generally for manufacturing purposes: *Held* the oil was not edible, was fit only for manufacturing or mechanical purposes, and was so free of duty under paragraph 626, tariff act of 1897.

HUNT, Associate Judge, dissenting.

United States Court of Customs Appeals, February 15, 1911.

APPEALS from United States Circuit Court for Southern District of New York (T. D. 29388; T. D. 30188).

[Reversed.]

*Frederick W. Brooks* and *James L. Gerry* for appellants.

*D. Frank Lloyd*, Assistant Attorney General (*John A. Kemp* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:

By agreement of counsel the cases of these six importers are heard together. They were likewise heard and considered together by the

Board of General Appraisers and by the Circuit Court for the Southern District of New York.

The importations are olive oil made at the port of New York in 1908. There are 19 protests covering 21 different lots of oil, each of which is represented by an agreed sample. As the record is made, we are unable to determine which, if any, particular sample represents any particular importation, and are unable to distinguish between the importations and treat them all as one. In other words, all are tested by the same rules and stand or fall together.

This oil was assessed for duty under paragraph 40 of the tariff act of 1897, the material part of which is as follows:

40. Olive oil, not specially provided for in this act, forty cents per gallon; in bottles, jars, tins, or similar packages, fifty cents per gallon.

The merchandise is claimed by the importers to be entitled to free entry under paragraph 626 of the same act, the material part of which reads:

626. * * * olive oil for manufacturing or mechanical purposes fit only for such use and valued at not more than sixty cents per gallon. * * *

It is agreed that these oils were valued at not more than 60 cents per gallon. The Board of General Appraisers sustained the collector's assessment, the Circuit Court for the Southern District of New York, upon the evidence taken before the board, affirmed its decision, and the cases are here on appeal by the importers.

The real question before us is whether upon the evidence we will reverse the judgment of the Board of General Appraisers and the Circuit Court, which was, in effect, that these olive oils at the time of importation were fit for other than manufacturing or mechanical purposes within the meaning of paragraph 626.

In the case of United States v. Reibe, heard at the June session, supra, p. 19 (T. D. 30776), the question of our authority to review questions of fact was considered and it was held that the provisions of the organic act establishing the court unquestionably vested it with such power. It was there held in substance that the court would not undertake to disturb the findings of the board upon doubtful questions of fact which turn upon the intelligence and credibility of witnesses that have been produced before the board, but when the finding of fact is wholly without evidence to support it or when it is clearly contrary to the weight of evidence, it is the duty of the court to disregard it, and we may now well add that the exercise of this power is one of the highest duties cast upon the court.

The organic act provides without distinction between them that questions of fact as well as of law shall be reviewed and a due regard for the right of litigants demands that in proper cases the power be unhesitatingly exercised. It is apparent that no hard and fast rule applicable to all cases can be expressed, but that each case must in a

large degree be decided in view of the conditions there found to exist. It is said by the counsel for the Government that there is so great a conflict in the evidence and so much that tends to support the findings of the board that we should affirm their findings.   It is necessary to analyze the evidence sufficiently to see what facts were in issue and the character and quality of the evidence introduced material to their determination.   At the outset we assume that all witnesses who were permitted to express their opinions upon the quality of these oils were, as the board evidently found them to be, qualified to give their opinion.   We also have in mind that the presumption is in favor of the correctness of the collector's classification and the burden upon the importers to affirmatively sustain their material contentions.

The cases were tried below and argued here by the Government upon the theory that the oils in question were not, within the meaning of the statute, fit only for manufacturing or mechanical uses, because they were fit to be used for food purposes, and it was to that issue that the evidence of both sides was directed.   The evidence of the importers, which was not contradicted by that of the Government, establishes the following propositions:

1. That the oil in question is manufactured and designed to be used for manufacturing or mechanical purposes.   That with respect to the olives from which it was made, the manipulations it undergoes in manufacture, and the containers in which it is sent to this country less attention is paid to cleanliness than in the case of oils designed for food purposes.   To briefly illustrate: This oil is made from partially decomposed olives, while the oil manufactured expressly for food purposes is made from sound olives.   This oil is generally shipped in second-hand barrels, some of which have formerly contained petroleum or creosote, while the so-called edible oils are generally imported in clean and new containers.   Some of this oil is brought to place of shipment in touloms, which are fresh goatskins recently stripped from the animals, having the holes resulting from the skinning process tied up.

2. That it was largely imported from parts of the Orient where relatively little oil designed for food purposes is produced.

3. That it was imported to be used for manufacturing or mechanical purposes and had been, so far as disposed of, sold or used for such purposes by the appellants, one testifying that he *used* 99 per cent of his importations in the manufacture of soap and others that theirs was sold by them for varying manufacturing and mechanical purposes according to the needs of their customers, to be used in the manufacture of silk and woolen goods, leather goods, soap, etc., but it does not clearly appear what part of these importations in fact had been so used.

4. That they were fit for use for manufacturing or mechanical purposes.

The appellants also introduced evidence that warrants the finding that these oils were not and could not be sold in the market as edible oils unless it is rebutted by the evidence of the Government tending to show that they are suitable for food purposes.

Presumably, in recognition of the burden cast upon them, the importers went ahead and introduced evidence from which we very briefly quote. Unless otherwise stated in connection with the evidence of a witness, he testified that he had examined all of the 21 samples of the importations.

Mr. Snevily, who is manager of the Oil Seeds Co., appellant, testified that the oils were not edible; that they were rancid; that he smelled or tasted of every sample; that if smelling left him in doubt as to the quality, he tasted; that he swallowed oil from some of the samples and that it nauseated him, causing his stomach to gas for several hours after taking it.

Mr. Smith, of the Holbrook Manufacturing Co., appellant, testified that the importations were manufacturing or mechanical oils; that he caused samples from five barrels involved in the protests to be prepared in a salad dressing, which he tasted; that the effect upon him was unpleasant; that it produced an acrid, unpleasant taste in the back of his throat; that the oils were all rancid and showed evidence of decomposition.

Mr. Lewis, manager of appellant Swan & Finch Co., testified that the oils were fair specimens of commercial oils; that he sampled them by smell and not by taste; that he did not care to taste any; that he thought they were rancid, and that there were evidences of decomposition.

Mr. Sherrill, connected with the appellant Welch, Holme & Clark Co., testified that these importations were commercial oils; that he had tasted of some of the samples, without saying how many, and had examined them all; that those he tasted were very bitter and had an unpleasant taste, and that he thought they were rancid.

Mr. Frederick, manager of the appellant firm of Arnold Hoffman & Co. (Inc.), testified that the oils all belong to the commercial class; that they were of poor quality and rancid.

Mr. Morawetz, of the appellant firm of A. Klipstein & Co., testified that he smelled all of the 21 samples and tasted of 3; that after tasting 3 he was happy to get out into the fresh air, and then went back and smelled of the others; that he found them all to be rancid.

Mr. Moellhausen, an importer of oils, but not a party, testified that the oils were not edible; that his testing was to find out the acridity, the taste, and the smell.

Mr. Athanassiades, an importer, but not a party, testified that the importations were commercial olive oils; that he could determine this by taste and smell; that commercial oil is rancid, is decomposed oil.

Mr. Newcomb, who represents several importing houses that are not parties, testified that he had tasted of four or five of the exhibits and

had smelled of all the others; that they were all mechanical oils and not edible; that he could not sell them as edible oils.

The three witnesses last mentioned amongst other things also testified as to the methods used in the Orient in the production and manufacture of similar oils.

Mr. Fuller, who is the head of the food division of the health department for the city of New York, but not a chemist, testified that he tasted of about 6 of the 21 exhibits selected at random and smelled of all of them; that he was sick all of the afternoon afterwards; that he thought that all were rancid, and he tasted those concerning whose rancidity he had any doubt; that he would have condemned every sample as unfit for food if offered for sale as such; that they were unfit for eating.

Mr. Sharples, a chemist of years of experience, some of the time in the Government employ and some of the time in the employ of the State of Massachusetts, testified that he had examined every sample, smelling all and tasting several concerning which he had doubt; that they were all strong-smelling, acrid oils, none of them having the beautiful nut-like flavor of a good olive oil; that the rancidity of these oils would condemn them without an analysis.

Mr. Pascual, an importer but not a party, testified that the exhibits were commercial oils and not edible oils; that he smelled of them but did not taste any; that he could tell by smell alone whether or not an oil was a commercial oil.

Mr. Hoese, a commission merchant and broker but not a party, testified that the samples were commercial and not edible oils and would not be salable in the United States as edible oils.

Mr. Hardy, of the firm of Maynard & Child and not a party to the suit, testified that he had examined six of the exhibits and that they were commercial oils.

The witnesses relied upon by the Government to sustain its claim that these oils are edible are Dr. Wiley, chief chemist of the Bureau of Chemistry of the Department of Agriculture and head of the food-inspection service under the food and drugs act, and Dr. Doolittle, the chemist in charge of the New York laboratory of the Bureau of Chemistry of the Department of Agriculture, and Mr. Kleine, the United States customs examiner, who passed upon the importations in question.

Drs. Wiley and Doolittle are chemists of long experience and have also had much experience in examining olive oils. Dr. Wiley did not chemically test any of the exhibits, but relied on the chemical analysis made by Dr. Doolittle embodied in Exhibit G. He testified that he tasted and smelled only five or six of the sample exhibits picked out at random and that they were brilliant in color, attractive in appearance and not bad tasting or smelling, but were edible. He later said he would admit as fit for consumption those which he tasted and whose

analysis he had seen. Speaking of edible olive oils generally, he said they average to contain 1¼ per cent of free fatty acids, and very frequently 2, 3, or 4 per cent and occasionally 5 or 6 per cent, seldom above that, and that a percentage of 4.72 was extraordinarily high. In another connection, he said if rancidity had not advanced to any great extent, it did not render the oil unfit for eating. Again, he said if he were a physician prescribing olive oil for a patient's use in cases of constipation, he would prescribe a much better oil than the exhibits in question, and that if he were choosing edible olive oils, he would not choose any of these exhibits for himself. He preferred a better oil.

The doctor's idea of what is an edible oil may be gathered from the following extracts from the record:

Q. How much rancidity has a given oil got to have to be unfit for consumption?—A. So much so that it could not be eaten by the people who commonly eat oil.

Q. You mean by the average citizen?—A. The people who are used to eating oil; specially foreigners, who eat more foreign oils than Americans; Italians and Greeks, anything that they can eat would be a food product.

Q. Anything that they can eat would be fit for consumption?—A. No, sir; but would be a food product.

Q. It is edible if they can eat it?—A. It is edible if they can eat it. It might not be fit for food.

Q. It might not be fit to eat, although edible?—A. Yes.

Q. But it is not fit to be eaten because it is eaten?—A. If it is eaten it is edible; if it is used for food, it should pay duty.

Dr. Doolittle testified that he made a chemical and physical examination of each of the 21 samples and that the results of same appeared on Exhibit G; that he smelled and tasted of each sample; that they were all edible oils, such as are ordinarily used for consumption, as having come within his experience, and by referring to Exhibit G it will be noted that he detected no rancidity. It does appear there that, as to seven samples, he found them to be slightly resinous or detected a slight resinous-like aftertaste, and, as to three others, he reported that their taste was a little off or that they were not good tasting, but these unfavorable conditions were not sufficient, in his opinion, to render such samples unfit for food.

When specially interrogated if all these oils could be commonly used for edible purposes, he said: "They might be; they are suitable for edible purposes;" that if an oil smelled bad it would be unfit for human consumption; if it had a repulsive taste, it would likewise be unfit; and that there was no standard of taste or smell except that of experience, and his standard was his individual experience. Rancidity, he said, produced a bad taste in the back part of the throat, with a sort of a contraction of the back part of the mouth. He said if oil contained more than 4 per cent free fatty acid, it should be examined pretty carefully. His chemical analysis (Exhibit G) shows each sample to contain free fatty acid, ranging from a minimum of 1.60 per

cent to a maximum of 6.32 per cent. The aggregate of these percentages divided by the number representing the samples gives an average of 3.45 per cent.

Mr. Kleine testified that he tested each sample by taste and smell; that he smelled for the odor and tasted to detect a rancidity or bad taste. His experience in testing oils was confined to three and one-half years' service as examiner. He considered as edible those oils he would eat himself, and one he would not eat he considered nonedible, and did not take into consideration whether others would or would not eat them. If the oil was good enough for him to eat, he passed it for duty; if not, he passed it free.

It is clear from the evidence that there is not sufficient acidity in these oils to render them nonedible, although its existence in a degree so much above the average in edible oils may be a suspicious circumstance. Acidity, however, is only one quality to be considered in determining edibility. Rancidity, bad smell, and bad taste are at least equally important, and the evidence shows that rancidity is probably due to decomposition.

The witnesses all agreed that rancidity can not be detected by any known chemical test, but resort must be had to the exercise of the sense of smell or taste or both to find it. Two of the Government's witnesses did not discover it in any of the samples, and the other did not find it in six of them and did not examine the others. All this is negative evidence. Six at least of the importers' witnesses did discover it, and some of these said the oils smelled or tasted badly. This is positive evidence. In addition, there is the evidence of witnesses above referred to as to results which followed their smelling or tasting these oils. These results could not have followed had the oils been wholesome, and it seems to us that the methods which are shown to be employed in manufacturing, handling, and shipping these oils make it probable that similar results would follow an attempt to use them for human consumption

There was no evidence tending to show that these oils were used as an article of food. The *theory* of the Government's witnesses that they are edible is not entirely satisfying. Especially is this true when we find positive evidence of seven witnesses, six of whom are not party to any of these suits, that they are not edible.

The consideration of the whole evidence results in this—the oils have been affirmatively shown to be nonedible. This proof is met only by evidence that witnesses did not discover its nonedibility. One is positive, the other negative. So far as mere number of witnesses is concerned, the preponderance is greatly in favor of the appellants. So far as ability and skill in testing oils for rancidity is concerned, we think the witnesses for the importers are at least the equal of those of the Government, and we are of the opinion that the

finding of the board that the oil is edible is clearly contrary to the weight of the evidence.

That part of the opinion of the board which reads as follows—

When it is remembered that all of the witnesses called by protestants, with two exceptions, are directly or indirectly interested in the success of protestants' claim, we think there is a preponderance of evidence to sustain the classification made by the collector. Especially do we think this view justifiable when it is remembered that the National Government has manifested its confidence in Drs. Wiley and Doolittle by placing upon them the responsibility of determining what foodstuffs may and may not be placed upon the markets of the country for sale as being fit for human consumption. A finding that their combined judgment as to these oils should not be accepted would, as we view it, be equivalent to saying that the confidence of the Government in their expert ability had been misplaced, and to this extent we are not prepared to go, nor could such a conclusion, in our opinion, be justified by the record—

we think discloses an erroneous rule for weighing the Government's evidence, which, had it not been adopted, would probably have resulted in a different conclusion. There is no evidence that witnesses other than the appellants are interested in the result. It is going far to assume from the fact that a witness is an importer or dealer in oils that he is not credible. It may as well be assumed that the Government's witnesses, all of whom are in its employ, are biased by the fact of their employment. It is certainly going too far to assume that a finding adverse to the evidence given by the witnesses for the Government is equivalent to an impeachment of their efficiency or ability in the official position they may fill, and it is error to let the fear of such a result influence the determination of a question of fact by a tribunal before which such witnesses may testify. They are, of course, like other witnesses, entitled to have the weight given to their evidence which under the circumstances—and their official position is but a circumstance—it is legally entitled to receive; nothing more, nothing less.

Upon the evidence we are satisfied it was the duty of the board and the Circuit Court to have found that the oils were fit only for use for manufacturing or mechanical purposes under paragraph 626. We so find, upon the evidence, and therefore the decision of the Circuit Court and the board is *reversed*.

DISSENTING OPINION.

HUNT, Associate Judge, dissenting: I am constrained to dissent. The question involved in the case was purely one of fact, upon which there was a serious and direct conflict of evidence. To resolve this conflict was peculiarly the province of the board, sitting as triers of fact. They saw the witnesses, observed their manner, heard their statements, and thereafter concluded that the weight of evidence was in favor of the view that the olive oils involved were edible.

After a careful reading of the entire testimony, including that of Drs. Wiley and Doolittle, produced by the Government, my opinion

is that the decision of the board is supported by evidence which is positive, substantial, and sufficient. For instance, Dr. Doolittle, a chemist of skill and experience and who made analysis of the oils, said in part:

* * * The chemical examination was for the purpose of determining whether or not they were olive oil. I also submitted them to certain physical tests, smell, taste, appearance, color, etc., to determine whether they were fit for edible purposes. Food products are often submitted to me for examination. Among other things I examine olive oil from time to time to determine its quality and character. Speaking of the free fatty acids, free acids as oleic, that is a purely chemical analysis. The determination of free fatty acids is done chemically. It is a comparatively simple process. You simply take a given amount of the oil and dissolve it in neutral alcohol and titrate that against a standard solution of alkali. Alkali is to neutralize the amount of acid in that and from the amount of alkali it takes it gives the amount of acid there is present in the oil. From that I determine the free fatty acid there is in the oil or in any other substance. The process I have just given is one in common use for the determination of free fatty acids in olive oil. I made a determination of certain constants in the oil to inform me whether or not it was pure olive oil. We determined the specific gravity in most instances where we had plenty of material, the index of refraction, the iodine number, and then we tested them all for the common oils that would be used for adulterating olive oil, such as cotton seed, sesame, and peanut. These oils were pure olive oils. They were all of them found to be clear and of good color—that is, the ordinary color of olive oil ordinarily used for food consumption.

I submitted every one of these to a full examination, both chemical and what you might call physical examination, and went over them very carefully and wrote out my conclusion on each of the oils, and these conclusions are in this report signed by me. In my opinion, they are all edible oils, such as are ordinarily used for consumption, as having come in my experience—such as have come under my observation, imported oils in the market.

The credibility and weight of this testimony were for the board to pass upon. Having believed it, their conclusion ought not to be disturbed, unless in weighing the evidence they proceeded upon some erroneous principle. And whether they did or not is, to my mind, the one important point in the case. I agree thoroughly with my learned associates in their expression to the effect that fear of possible effects upon the reputations of experts for the Government can have no proper place in weighing evidence, and if it appeared to me that the board was directed to its conclusion because of the influence of such fears, I should concur in reversal of the case. But the opinion of the board puts its decision upon grounds indepenpent of such moving causes by stating its finding before it proceeds to invoke the erroneous argument, declaring its view "especially * * * justifiable." Moreover, in its conclusion it reiterates the opinion that any finding other than that which it has made would not be justified by the record.

The case stands, therefore, as I look at it, as one where the presumptions in favor of the finding of the lower tribunal are strong enough to obtain and to require affirmance. Manson *v.* Williams (213 U. S., 453).